Lainez Maradiaga v. Garland Mr. Havlick Havlick Okay, and you've reserved three minutes for rebuttal, is that correct? Correct, thank you.  Thank you, your honors. May it please the court, Malik Havlick for petitioner Roger Lainez. We are here because the government is insisting incorrectly that Mr. Lainez has had his boots on. We have one person on Zoom and one person who is having some tech issue. If you don't mind making sure that you speak into the mic and you can raise it at the podium if you're not comfortable. Is that better? Is it good enough for you? Thank you so much. The government is incorrectly insisting that Mr. Lainez has had his paternity established by legitimation within the meaning of former section 321 of the INA and that as a result he is foreclosed from having received derivative citizenship from his mother who naturalized when he was 14 years old. She's the only parental custodian he's ever had. His biological parents never married and his father is a virtual stranger to him. The core issue before the court to resolve that issue is one of Salvadoran law, I submit. There does not appear to be a dispute between us and the government, at least on the government's submissions, as to the appropriate understanding of section 321 in the phrase paternity established by legitimation. So I have like a big picture question. Is it possible that there is simply a gap in the statute? The fact that the statute assumes a world where people are with their parents, that they're not contemplating the idea of somebody who, like your client, knows who their father is, but is not taking the sort of parental responsibilities that one would hope. And if that's the case, what are we in a position to do about it as opposed to, say, Congress? I think that the answer in this case is no. I think that you've identified a very important tension, both between section 321 in the phrase paternity established by legitimation there and the standalone term legitimated in section 1, which the cross in the BIA tried to address. I do think there is, if one adopts a strict textual reading of the original language and uses a fixed meaning canon, then I don't think there is a gap per se. It simply means that legitimation, as it was understood by Congress at the time, would govern, and that legitimation, as it was understood by Congress at the time, would have meant either marriage or some form of judicial process, then in turn governed by the local legislation of the jurisdiction at issue. I think since 1977 in Lauvie-Kiley, the courts have tried and the BIA have tried to adopt to the reality on the ground, and that's created some incongruence, but I don't think the statute as it stands alone. Okay. There are two different statutory sections. One of them says and has been taken to mean that if somebody is treated in a particular way as your client was in El Salvador, he can't be discriminated against with respect to visas and things of that sort. The other section deals instead with whether he has been legitimated for purposes of becoming a citizen. Now, as to that, why are the two the same at all? And there my only question is, does the fact that the father originally, when he was born, recognized paternity make a difference? This was before the El Salvador law was changed. Before the El Salvador law was changed, I think it's uncontested that no, it would not. If I'm understanding the phrasing of your question correctly, no, it would not make a difference in the sense that at that time, it would be, I think even the government would not dispute that he had not been legitimated under any section, whether it's section 101 and the legitimated standard or the narrower paternity established by legitimation. And what you're saying is, if we applied this as the government says to apply it, somebody who wouldn't even know who his father was would, because El Salvador says he can't be discriminated against, be barred from becoming a citizen when his mother did. I think that's exactly right, Your Honor. That is the exact problem with the government interpretation of the statute, which is that if paternity established by legitimation can be accomplished by legislative fiat in a depersonalized basis by simply declaring all children legitimate, then the phrase, then the words paternity by are meaningless in the statute. And you'd have a situation where a child who has no idea who his parents, who his father is, is deemed to have had his paternity established by legitimation. I think that- So that's one route. There's another route that you suggest, which is recognizing the concept of abandonment, sort of retroactively impacting whether or not somebody was recognized. How are we supposed to know whether or not El Salvador law contemplates the idea of abandonment? Is that something we should send back to the BIA, or is that something that a district court needs to examine? Is that something you need experts for? How do we know whether or not you are correct? In the Flores-Torres decision- Okay, which is not binding on us and not even binding on the Ninth Circuit. I accept that. And what Mr. Lane has, what we really use that decision for, almost exclusively, is strictly for its articulation of Salvadoran law, because it is the rare instance of a court that had the benefit of expert opinions on both sides on this issue on Salvadoran law. And in that decision, the court's conclusion, based on the expert testimony, was that someone in Mr. Lanez's father's position, at least based on his conduct, would have forfeited his parental rights under Salvadoran law. If that is unsatisfactory in terms of the legal development, then I think the appropriate thing to do to this court, then I think the appropriate thing to do would be to remand it to the district court. Oh no, we would have to transfer it, right? Correct, correct. That's correct. So as between the BIA and the district court, you think the next step is the district court? I think that's correct, if this court is not satisfied with the conclusions of law articulated by the- Yeah, it is. From your point of view, we can do one of two things. We can say these two sections of the statute mean different things. The one that simply says if somebody has been treated not to be discriminated against, that isn't enough to legitimate him for this section, in which case your client is a citizen as a matter of law. The other one is if that depends on what this anti-discrimination statute in El Salvador means, you say send it back to the district court to find out what El Salvadoran law is. Yes, Your Honor, that's essentially correct, except I'd add one caveat to the last element, which is that we think based on the record of Salvadoran law- We could do it ourselves. Exactly, because I think that, with my last 50 seconds, I'll try to- Remember, it's our time. We'll keep you as long as we need to. So I think that this is important, that the expert that authored the Library of Congress report on which the government relies almost exclusively for its propositions of Salvadoran law was examined during the Flores-Torres case and essentially admitted that in El Salvador law, during the relevant period, there were certain preferential treatment was given to the- so to speak, the parents would have joint custody. But in the event of a non-legitimate child, the mother would have preferential custody. So Ms. Gutierrez, the expert that the government relies on, admitted that the Constitution, which did admittedly equalize the legal status of children with respect to discrimination in their rights vis-a-vis their parents, did not purport to eliminate this preferential treatment given to so-called legitimate or, I should say, natural mothers. So that, to us, indicates that there were legal distinctions that still existed in the Salvadoran law, that the 1983 Constitution's abolition of discrimination was not as sweeping as the government would say. And that, therefore, means that the formal legitimation mechanism of marriage still prevailed, at least. And there were a few other ongoing statutory artifacts where this classification continued to exist, provided it didn't have an impact on the rights of the children. And that is not surprising, that a country would retain a formal legitimation mechanism, so some legal means of recognizing a traditional family unit, provided that children outside of that structure were nevertheless treated equally and with the same amount of dignity. So I want to make sure that Judge Gabonis can jump in if he wants to, but I have one other question for you. Certainly, if this court thought it appropriate to send to either the VA or the District Court for an assessment of what was El Salvadoran law, that would apply to whom? Just your client? To any person from El Salvador? I think just our client. But the bigger question, for us to rule as a matter of law that these general statutes conferring equality under the law do not establish legitimation pursuant to the INA standard, that would be a ruling that would apply to every country that has a similarly worded statute? No, Your Honor. First, I don't think there needs to be a ruling on the meaning of Section 101. I think there is an established body of law. Section 101 is not at issue in this case. I think the court can limit itself to determining the issues under Section 321 and specifically under El Salvadoran law. So you don't think that this case causes us to say something like paternity cannot be established through general statute or requires an affirmative act as you seem to indicate in the briefs? That would be one of general applicability, right? That wouldn't be something pursuant to just what's going on in El Salvador. I think the applicable standard that we see is the one articulated by Cross and adopted by this court in US v. Lewis under Guyana law, which is that provided that a formal legitimation mechanism exists, an affirmative act pursuant to that mechanism should be followed to achieve... Okay, so then that's a big one, right? That means any state, any country that has some sort of legitimation like that, whether it be Guyana, whether it be El Salvador, that would be how we interpret that statute. I believe so. Okay, so yeah, because it sounds like you are, one, offering a very narrow one, and another very, very, very big, or at least I thought it was very big. That is the distinction that currently was articulated by the BIA. Well, but the point of that is that in those situations where there is something of that sort, someone who is in the position of being treated equally under the law but does not know who their father is or the father is, does not get denied citizenship because of the father. And that's a perfectly rational position. So I wouldn't abandon it if I were you. Judge, that what you described would apply to Section 101, which defines a child for various purposes of various benefits within the BIA. And I think we have absolutely no intention of disturbing the notion that a generalized legitimation statute or a statute that bars discrimination against children based on wedlock should remain undisturbed and that that would constitute legitimated within the meaning of that statute. Our limited concern is in the event of the phrase paternity established by legitimation under Section 321 and ensuring that we avoid the situation we have here where a petitioner who has no real relationship with his father, who is a deadbeat, frankly, to use the word, and is now tethered to this complete stranger's nationality, even though the language of the statute refers to paternity established by legitimation to use this language, and contemplates protecting the rights of fathers. And here we have a father who has chosen essentially not to exercise those rights or waive them. Thank you. So I think, Judge Gabonis, you want to jump in? I do. I won't jump, but I'll just ask a simple question. Mr. Havlick, this statute seems to me to be a very strange statute. I'm referring to 1432A3. I've now served on the court long enough as Judge Calabresi to have experienced, to have encountered literally hundreds or thousands of immigration cases. Walk me through this statute, Section 1432A3. What is it designed to do? How does it work exactly? Yes. So this is the former statute, for one. It's no longer in effect, so that's one point. 1432- I'm sorry, what did you just say? It's no longer in effect. It's been repealed since 2001, I believe. So that's just a general note that we're not changing the current law. So it establishes the derivative citizenship as distinct from acquired citizenship. So when a child becomes naturalized by following the naturalization of their parents. And there's essentially three categories. The first is the naturalization of both parents. So when mom and dad become naturalized U.S. citizens, then the child under the age of 18 automatically follows. That's how I became a citizen. I as well, Your Honor. The second is the naturalization of the surviving parent if one of the parents is deceased, which is straightforward. And then we have our provision, which is the naturalization of the parent having legal custody of the child where there has been a legal separation of the parents. So that's one. All right. So how does it work? Legitimation. It seems rather odd, does it not, as a policy matter, that an applicant for citizenship would be prejudiced by legitimation. Is that the case here? I'm sorry, Your Honor. I couldn't quite catch that last part, that the applicant for citizenship would be prejudiced by legitimation. Isn't that what this statute provides? In a way, Your Honor, I think what Congress's intent in passing this particular piece of the statute, which is a negative paternity had not been established by legitimation, is essentially meant to protect the parental rights of a father whose spouse or the children's mother is now with the children, has legal custody of the children, and then naturalizes on her own. The idea is to prevent essentially the alienation of the child from the father on a unilateral basis. And when Congress enacted this, I don't think it's controverted that in its mind in 1952, when it referred to legitimation, it had in mind a married couple where simply the – I'll avoid the Latin term, but it's an old principle from the days of Constantine, that when a child was born out of wedlock, the subsequent marriage of the children nevertheless legitimated the child. So that would have been married couples. The subsequent marriage of the parents, you just said children. That's what I meant. Thank you. So that the subsequent – so what the statute was envisioning is a married couple whose child was born out of wedlock, but then they married. But you're not arguing that it needs to be a marriage. You're arguing that some action by the father to – that is recognized as legitimation is enough to do that. I think that's correct, Your Honor. And I do think that there's some potential issue where there's this – in some jurisdictions, it's been found that the father's recognition of the child through a birth certificate – by acknowledging the birth certificate or a registry is sufficient under 321. We do not take that view. But you're right, Your Honor, because the statute does not say the marriage of the parents. It says legitimation, which implies that there's other mechanisms of legitimation under the laws of whatever jurisdiction is at issue. But one of those must take place, and you say that recognition before a standard of no discrimination by a father who then disappears does not meet the requirement of that statute. I think that's correct, Your Honor. There could be a situation where there is a marriage and the father then disappears. Then it's a much trickier – That's a different – That's a much trickier situation, but that's not the one we're in, thankfully. Yeah. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Nancy Cantor on behalf of the Attorney General. The petition for review should be denied because petitioner simply failed to meet his burden of demonstrating that he derives citizenship under 1432A3. Under 1432A3, the relevant provision is that the individual derives citizenship upon the naturalization of the mother if the child was born out of wedlock, which I believe petitioner concedes is not at issue, and the paternity of the child has not been established by legitimation. Numerous courts of appeals have recognized that – What if the mother had abandoned the children at birth and the father had shown up, and then would the mother have the same sort of rights? How are we supposed to understand the fact that the law at that time assumed a certain set of worldview? And what are we as judges capable of doing about it? Well, I think we as – I think that you as judges, there's not really a whole lot, unfortunately, that we can do or that you can do. The purpose of the El Salvadoran law was to put the children by their legitimate – No, no, no. I'm going to stick with our statute, right? Like the fact that it's very gendered, the fact that it's paternity, the fact that – like the – is that something that you would say we would be bound by? Or do we have some room to interpret it the way that your colleague on the other side said it was what they intended to establish back then, which assumed a certain set of facts that don't squarely hold in this case? I'm not sure, Your Honor, that there is anything that can be done. I believe and I don't believe it was raised in the briefing in this court, but we'd be happy to – we would be happy to do supplemental briefing on the issue of whether there are equal protection concerns with regards to the statute. Let me go back to my basic problem. A nation passes a law that says that somebody who is born out of wedlock shall not be discriminated against. That's what the El Salvadoran law does. Who the father is may be totally unknown. The father may indeed be an American citizen, and yet the child wouldn't know it because the father doesn't exist for that child because this law gives these rights of nondiscrimination without having the father identify himself. How can you say that that law bars somebody whose mother is a citizen from citizenship? It becomes – it seems absurd to say that a law that says there shall be no discrimination but in no way requires the father to identify himself would bar somebody from citizenship when the father may himself be a citizen and the child wouldn't know it because he wouldn't know who the father was. I mean, unfortunately, Your Honor, we're looking into – we're looking at what El Salvadoran law does, and that's not what this court is asked to do in interpreting whether a child – No, no. El Salvadoran law says there shall be no discrimination. That's what that says, and shall be treated as legitimate for those purposes. But we're not that interested in El Salvadoran law. We're interested whether the two sections of American law, the one which says when there shall be no discrimination, there shall be no discrimination in asking for visas and things like that. That's one section. And the other section, which says as to naturalization, somebody has been – had to have been legitimated. That is, some action of a part – either the intent of a part of a father. Well, I think the difficulty, Your Honor, with that is, you know, I think the Ninth Circuit, the Third Circuit have recognized that 1432A, the objective was to protect – to provide the broadest protections to the alien parent's rights, and that would be the father. So, unfortunately, that this father was not involved in this petitioner's life is regrettable, but – However, it is something to protect the father, then wouldn't we expect at least some action by the father that would identify himself, and then he might be protected? That is, again, if a father at any point after the El Salvadoran law is passed comes in and says, yes, it's me, then all my problems disappear. Well, I think, Your Honor, requiring some action would put this court in line with cases where – I mean, I submit that Flores-Torres was wrongly decided and would not be decided the same way today if it had the benefit of other Ninth Circuit and Circuit case law, but you're reading an implicit or a requirement into the statute that is simply not there. The 1432A-3 simply requires legitimation. The statute says legitimation, and the question is whether a statute that doesn't require any actions by the father when the law of that circuit allows for actions by the father – I mean, you know, it might be different if there weren't any, but El Salvadoran law concededly allows actions by the father – that an anti-discrimination statute automatically bars somebody who would otherwise be a citizen to protect a father who hasn't done anything. I mean, why – just reading the statute seems to me absurd that way. So maybe I can ask the question a different way, and maybe not. Maybe this will be exactly in line or more confusing. It seems to me that one version of what the appellants are asking is that we require an affirmative action on the part of the father in order to say that paternity is material because these general statutes of equality aren't enough. You are saying allowing my name to be put on a birth certificate or my name being put on a birth certificate is effectively that action and that is enough. Is that – I mean, is that – and then aren't we supposed to then figure out does El Salvador law comport more closely with their version or your version, right? Because you're not saying there's not an affirmative act. You're saying that the act is the fact that his paternity was known because it's now on the birth certificate. Is that – am I thinking about this the right way? I think we're missing a step there. Okay. Please, help me. The step being that we would look to El Salvador's law to determine whether a step is required. So there are some jurisdictions where an affirmative act is required, right? But you are – so you are saying it matters not at all that the name is on the birth certificate and that we know who he is. That is a completely irrelevant fact because El Salvador has this equalizing – or this statute that you're calling equalizing. Is that something you're willing to concede now? It is – I'm not ready to concede. I have to think about this. I thought that's what you're arguing. No, no. I may be able to but I'd have to think about that. It's a relevant factor as to the issues of fact, as to where – it's relevant issues. I mean, I want to – I'm going to get, Your Honor, to this question. But I think, you know, when we look at the first part of 1432A.3, when we look at the naturalization of the parent having legal custody of the child, courts of appeals defer to state law as to whether or not legal custody exists. So when we look to legitimation under the second part, latter portion of 1432A.3, the court should look to the foreign jurisdictions law to determine whether legitimation has occurred. And courts of appeals – not this court conceitedly, but we ask this court to hold – have recognized that when a foreign law, like El Salvador did, amends its law to put a child born out of wedlock in the same legal position as a child born in wedlock, that legitimation has occurred. So that – Even though – and you're saying even though the father may not be known. That is, that law in El Salvador applies regardless of whether the father has signed the birth certificate or not. So your argument seems to be that this law legitimating, you say, or non-discriminating, I say, is enough to bar a person from becoming an American citizen on the basis of a father who may not be known or may be an American citizen. I mean, regrettably, Your Honor, that is the law of the First, the Third, and the Ninth Circuit. That is what you say is the law. That is the – I mean, and so returning back to whether the name on the birth certificate matters, I don't believe the name on the birth certificate actually matters in this case, because when looking at legitimation, the question is whether the child is born out of wedlock or in wedlock. Here we know who the father is. Okay, so let me ask a question then. If we disagree with you and think that it is not – that we are not going to go as far as saying a general statute of equality is enough to establish paternity or legitimation, do you think a district court or the BIA should be the one to decide what El Salvadoran law says is sufficient for establishing paternity? Who's better to do it? And after Chevron. I believe this court can do it, Your Honor. I believe that what El Salvador law says on legitimation is a legal question this court can decide. Let's again stick with my hypothetical. As between the two, which one do you think is more capable and qualified and more appropriate? I believe the court could remand – should remand to the board instead of transfer, because there is not an issue of material fact that 1252B5 contemplates. 1252B5 contemplates, you know, identity of the father, physical presence, et cetera. These are legal issues. I would send it back to the board, Your Honor. To the BIA? Yes. Judge Capodonis, do you have any more questions? No, that's it. Thank you very much. Thank you. Thank you. Very quickly, just on the last point on the BIA. I think, first of all, when this case was before this court in 2018 or 2019 with virtually the same facts, the government wrote a letter and did say that there were material issues of fact. So that's their previous position. And I do think that if this court feels that further examination of El Salvadoran law is necessary, the district court is much better positioned to do so in no small part because there may be then other fact-finding issues that turn on those issues. So if there is some action that is identified that hasn't been addressed in this record, there needs to be then additional fact-finding and not strictly matters of law. So if we're going into Salvadoran law, there may be adjacent facts that the district court is best positioned. I have a question. Does it matter that the father signed the birth certificate before this El Salvadoran law was passed rather than after? That is, if we read our law as requiring an act by the father that accepts legitimation, does a signature before such a signature does nothing to legitimate? And then El Salvadoran law comes in and says no discrimination. Is that different in a situation if after such a law is there, the father says, I am the father? Your Honor, based on our understanding of Salvadoran law, the signature on the birth certificate, and it's actually not a birth certificate, it's a birth registry, but in any event, the signature prior to the Constitution changes the child's classification under the existing strata within Salvadoran law. That seems to persist from 1983 up until 1994 during the relevant period. And that persists on these issues such as the father's custodial rights. So if the father never signed the birth certificate, as I understand the Salvadoran law, he would have no custodial rights because he was an unrecognized father. When he signs the birth certificates, the child becomes a natural child, and this is the father of the natural child. He has subordinate custodial rights to the child. That custodial regime persists notwithstanding the 83 Constitution's equalization of the children's rights. So these distinctions still persist even though the child itself is on an equalized status after the 83 Constitution. But the father now maintains a subordinated custodial right. Thank you. Just one final point on the BIA is I just want to emphasize, given our position that Mr. Léñez was entitled to derivative citizenship in 1985, in our view, any ongoing proceedings for Mr. Léñez in the immigration courts constitutes an ongoing harm to him because those courts do not have jurisdiction over U.S. citizens. Thank you. I think this was very capably argued. We appreciate it, and we will take it under advisement. Thank you so much.